21 N.Y.2d 518 (1968)
Victor E. Letendre, Respondent,
v.
Hartford Accident and Indemnity Company, Appellant.
Court of Appeals of the State of New York.
Argued January 2, 1968.
Decided February 29, 1968.
Homer E. Peters and Livingston T. Coulter for appellant.
Arthur J. Harvey and Thomas F. Farrell for respondent.
Chief Judge FULD and Judges SCILEPPI and BERGAN concur with Judge KEATING; Judge BREITEL dissents and votes to reverse and to grant a new trial in an opinion in which Judges BURKE and JASEN concur.
*520 KEATING, J.
Victor E. Letendre owned a gas station and motel in Malta (near Saratoga Springs), New York. In September of 1962, he left for Florida, where he operated a restaurant, leaving behind, in complete charge of his New York enterprise, one James J. Tremblay. Tremblay was a relatively new employee. Before departing, Letendre secured a fidelity bond on Tremblay in the sum of $5,000 from the Hartford Accident and Indemnity Company, the appellant here.[1]
In late May, 1963, Letendre returned to Malta. In examining the business records for the period of his absence, he soon discovered serious discrepancies in the records and inventory as well as apparent shortages in the bank accounts of his *521 business. He promptly reported the loss to appellant's claim agent, to whom he also turned over his papers.
On June 12, 1963 Tremblay went to the agent's office where he signed a statement in which he denied stealing any money or falsifying records. He attributed the shortages to either poor management or poor mathematics or both. A week later, Tremblay gave a second statement to the agent. Again he denied any wrongdoing, but now stated that he could offer no explanation for the missing money.
On July 9, 1963 Tremblay gave still another statement to the appellant's agent; this time, however, he incriminated himself by confessing to a defalcation of at least $5,000. During this period Tremblay had continued to work for Letendre, but without pay, in order to make good the loss. Following this third statement, Tremblay was discharged on July 18.
Fifteen days later Tremblay gave the last of this series of exculpatory and inculpatory explanations for the loss. On this occasion, Tremblay retracted his earlier statements. Even so, he acknowledged having stolen money, but he avowed that the limit of his peculations was the paltry sum of $400. His guilty admissions in the statement of July 9, Tremblay stated, were motivated by a sense of responsibility for his employer's loss. He had been charged with the duty of overseeing the operations of the station and the loss, he felt, had occurred because of his carelessness.
At the trial, Tremblay, whom plaintiff had subpoelig;naed, denied having embezzled any funds whatsoever. To recover against the insurer, plaintiff had to prove that his losses were ascribable to Tremblay's misconduct. On this issue, plaintiff's proof, apart from the incriminating statements of July 9 and August 2, was deficient. Tremblay did not in fact control the cash receipts or oversee the business records. The other employees had many opportunities to steal. It is evident, therefore, that without these two statements, which were taken by the insurer's representative during the course of its investigation, no verdict for the plaintiff could be sustained.
Faced with the prospect of ultimate dismissal of his action for insufficiency of proof on the issue of defalcation, plaintiff offered in evidence Tremblay's two inculpatory statements, and they were received. Appellant's trial counsel made timely and *522 proper objections upon the ground that under the rule of Hatch v. Elkins (65 N.Y. 489 [1875]) the extrajudicial declarations of a principal (Tremblay), made after the acts to which they relate, are not competent evidence against the surety (Hartford). Since the July 9 statement was made months after the defalcation, it would not have been admissible under the Hatch rule. In the trial court, Letendre recovered the full amount of the bond and the Appellate Division has affirmed. (27 A D 2d 205.) We granted leave. (19 N Y 2d 583.)
We agree with both courts below that Tremblay's statements were properly received. However, we do not view Hatch v. Elkins (supra) as distinguishable. Therefore, to the extent that the Hatch rule would require a contrary result, we reject it as unsound in principle and without support as a matter of both policy and justice. We see no reason to limit admissibility to res gestae statements and to exclude this obviously relevant and probative evidence.
We also agree with the Appellate Division that the admissibility of these inculpatory statements should not be dependent upon whether the employment relationship had terminated. (27 A D 2d, supra, p. 206.) Nor should the fact that the bond was no longer in effect at the time the statements were given be determinative. Making the admissibility of the statements turn on such circumstances would only introduce additional, hypertechnical distinctions which would serve no purpose. In an action by an employer to recover on a fidelity bond, an extrajudicial declaration made by his employee should be admissible as affirmative evidence against the surety, where the declaration is in writing and the declarant is available for purposes of cross-examination.
The primary policy reason for the rule of Hatch v. Elkins (supra) is the fear of collusion between the employer and his principal against the surety. The danger is certainly a real one, but this should not make the statements excludable. Every day in our trial courts, juries are called upon to determine whether particular evidence is tainted by collusion.
The danger of collusion is no greater here than in a personal injury action arising out of an automobile accident where the driver and the injured party are relatives or close friends. Yet, the Legislature has not thought it necessary for New York *523 to have a guest statute to prevent fraudulent claims against insurance companies. (See Babcock v. Jackson, 12 N Y 2d 473, 482-483.)
In reality, the risk of collusion is considerably less in a case like this than in the ordinary negligence suit. An extrajudicial admission of fault by a defendant driver always constitutes evidence in chief, despite the fact that the real party in interest is almost always an insurance company. A defendant in a negligence action hazards virtually nothing by making an admission, whereas the employee in an action on a fidelity bond risks jail by his admission of embezzlement. It is not likely that he would admit to a theft merely to accommodate his employer.
The Hatch rule works a gross injustice by depriving an employer of what may be the only substantial evidence he has and consequently may make it almost impossible in many cases  as in this one  for him to prove a case. Often the only evidence connecting the loss to the dishonesty of an employee may be the inculpatory statements thereafter made by the employee after the loss is discovered.
Moreover, the present rule offers no substantial protection to the surety from fraudulent claims. It would be a rather simple matter for an employer, willing to engage in a conspiracy to defraud an insurance company, to manufacture sufficient fraudulent evidence to make out a prima facie case even under the rule of Hatch v. Elkins (supra). On the other hand, the honest employer, who has been the victim of possibly ruinous fraud by an employee, may face an insurmountable problem of proof under the present rule.
The injustice of the existing rule is well illustrated by the facts of the present case. The possibility of collusion here was minimal. Hartford took complete charge of the investigations. Plaintiff's books and records were turned over to it. All of Tremblay's statements were obtained by Hartford's agents. The key statement of July 9, 1963 was taken from Tremblay only after he had been expressly warned that the confession might be used in subsequent criminal proceedings against him.
It might well be that Tremblay made the incriminating statements under pressure in order to protect his brother, who also worked at the station. But this is a motivation which could *524 lead any witness in almost any case to swear falsely. Nevertheless, no one would contend that, whenever the evidence indicates that a witness may be attempting to shield another, his testimony should be excluded. This is a matter for the fact-finder to weigh in making its determination. Likewise, the probative value of Tremblay's confessions was properly submitted to the jury for its evaluation.
Admittedly, Tremblay's statements were hearsay. Nevertheless, none of the classic dangers, which justify the hearsay rule, are present in this case. Hence, a departure from the general rule excluding hearsay evidence is proper here.
Declarant himself was present in court, subject to the oath and the safeguard of cross-examination. (See 5 Wigmore, Evidence [3d ed.], §§ 1361-1363; McCormick, Evidence, pp. 457-459.) The jury had ample opportunity to assess his credibility. Also the declaration was in writing and was taken by the appellant's agent. Thus there was no risk that Tremblay's words would be incorrectly reported.
Furthermore, the justification for the exception we create here is far stronger than that which supports many of the existing exceptions to the hearsay rule, where there is no opportunity for cross-examination. Had Tremblay died or disappeared, his statements would have been admissible as a declaration against interest since the statements were against Tremblay's pecuniary interest as well as his penal interest. (Kittredge v. Grannis, 244 N.Y. 168; Richardson, Evidence [9th ed., Prince], § 240.)
It is significant to note that, under the Model Code of Evidence as well as under almost every major proposal for reform of the law of evidence, Tremblay's statements would be admissible as evidence in chief. (Model Code of Evidence, rule 503; see, also, Uniform Rules of Evidence, rule 63, subd. [1]; Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L. Rev. 177, 192-196; Weinstein, Probative Force of Hearsay, 46 Iowa L. Rev. 331; 3 Wigmore, Evidence [3d ed.], § 1018.)
Although special cautionary instructions concerning the fact that Tremblay was not under oath when he made the statements would have been appropriate, the omission does not warrant a reversal here. It has never been the rule that a court must *525 always instruct the jury when hearsay evidence is admitted although in certain cases  as, for example, when dying declarations are admitted  special instructions may be required (People v. Mleczko, 298 N.Y. 153).
Often hearsay evidence has far more probative value than testimonial evidence. There was nothing in Tremblay's statements or in the circumstances under which they were given which made them less reliable than his testimony in court. The trial court here charged the jury to weigh carefully all the evidence, both testimonial and documentary, to sift it, to harmonize the discrepancies, if possible, and, when unable to do so, to decide where the truth lay.
In reaching our conclusion, we have adhered to the views expressed by Chief Judge FULD in his concurring opinion in Fleury v. Edwards (14 N Y 2d 334, 341): "The common law of evidence is constantly being refashioned by the courts of this and other jurisdictions to meet the demands of modern litigation. Exceptions to the hearsay rules are being broadened and created where necessary. [Citations.] Absent some strong public policy or a clear act of pre-emption by the Legislature, rules of evidence should be fashioned to further, not frustrate, the truth-finding function of the courts in civil cases."
The order should be affirmed, with costs.
BREITEL, J. (dissenting).
I dissent and vote to reverse and grant a new trial for prejudicial error in the admission into evidence of hearsay statements of a nonparty to the action. Since there was a substantial issue of fact upon the trial and the statements went to the fulcrum of the case, they may well have been decisive of the issue presented to the jury.
The admissibility of the extrajudicial statements depends upon whether, in actions against sureties, there is or ought to be some special exception to the general rules excluding hearsay statements. Since 1875, this court, relying on landmark precedents, has allowed of no such exception (Hatch v. Elkins, 65 N.Y. 489, 496). In the Hatch case the general rules excluding hearsay evidence were followed, but it was also observed, in language now classic, that statements made by the principal "during the transaction of the business for which the surety is bound, so as to become part of the res gestae are competent *526 evidence against the surety; but his declarations subsequently made are not competent" (p. 496). This was and still is the general rule (Ann.: Extrajudicial Admissions by Principal as Evidence against Surety, 60 A. L. R. 1500, 1504, 1509, 1514, 1521; Ann.: Fidelity Bond-Evidence, 65 ALR 2d 631 et seq.; 50 Am.Jur., Suretyship, § 196; 31A C. J. S., Evidence, § 366).
In this case, plaintiff Letendre owned a gasoline station in upstate New York and also a restaurant in Florida. From September, 1962 to May, 1963 Letendre remained continuously in Florida. He left in charge of the gasoline station for that period one Tremblay, an employee of his since the prior January, for whom he had obtained a fidelity bond from defendant surety. After his return to New York, Letendre reviewed the daily and monthly records of the receipts and disbursements. These contained computations of the periodic surpluses of receipts over disbursements, and indicated that surpluses had been deposited in Letendre's bank account. The indicated deposits did not agree with the actual bank deposits. And, of course, there was a consequent shortage in the bank account. Subject to various adjustments, Letendre claims an unexplained discrepancy or loss in the range of $5,600 and upward. Tremblay's bond was in the amount of $5,000, and was conditioned on the commission of dishonest or fraudulent acts by him.
The fact of the discrepancy between the station records and the bank records is undisputed and is, therefore, a conclusive datum in the case. Very much at issue on the trial, however, was whether there was a credible explanation for the discrepancy.
Letendre testified and admitted that substantial disbursements, upward of $3,000, were properly made by Tremblay and, for reasons not disclosed, were not recorded in the station records. Most of these were payroll disbursements. Tremblay, called as a witness by Letendre, testified that the whole discrepancy was explained by such unrecorded, but authorized, disbursements. If that were all to the case, and if Tremblay's trial testimony were believed, plaintiff must, of course, have failed to recover. The issue, one of credibility of Tremblay, was for the jury to decide.
But before Tremblay was called as a witness, Letendre offered in evidence two written statements by Tremblay in which he admitted stealing the money, thus accounting for the discrepancy. *527 Interestingly, Tremblay at all times held another full-time job, and he denied that he had any extraordinary need for additional funds. He could not explain when, why, or for what he had spent the stolen funds. These written statements were made long after the alleged larcenies, and months after Letendre had returned to New York, but while Tremblay was still employed by Letendre, although no longer as manager. The statements, of course, were in the classic form of extrajudicial hearsay statements, the contents of which purported to narrate what had happened in the past. However, in his trial testimony, Tremblay sought to explain these inculpatory statements by his feeling when he made them that, as the manager in charge, he was morally responsible for what appeared to be unresolvable discrepancies on the records and for poor management in having too much "help", that is, employees.
Before making the inculpatory statements Tremblay had made two other written statements to the surety's claims agent. Each of these was exculpatory and denied any wrongdoing. The later and inculpatory statements were also made to the claims agent, but only after Letendre had brought the still-employed Tremblay to the claims agent and had said that Tremblay had something to reveal. The earlier exculpatory statements were received in evidence eventually on the offer of defendant surety.
Less than two weeks after the first of his inculpatory statements, Tremblay was dismissed from Letendre's employment on the advice of Letendre's lawyer. There were other circumstances established relating to the suggestion that Tremblay be criminally prosecuted, but these are relevant only on the issues of credibility of Letendre in the case. They do not bear on the legal question whether the inculpatory statements were admissible on the case in chief and probative of an operative fact in plaintiff's cause, as distinguished from being used to impeach Tremblay. He, although called as a witness by Letendre, was hardly a friendly witness on the trial. Defendant surety rested on plaintiff's case.
The trial court charged the jury that it might weigh the exhibits in the case, and particularly the several statements taken from Tremblay. The jury returned a verdict in favor of plaintiff Letendre for the amount of the bond.
*528 The Appellate Division, agreeing that the admission of the Tremblay statements violated the rule in the Hatch case (65 N.Y. 489, 496, supra), held that the law was in some doubt and propounded a new special rule for fidelity bond cases, stressing that the statements were made while Tremblay was still employed by Letendre. It also held that defendant had failed to make proper objection or preserve its objection to the admissibility of the statements.[1]
The first issue, then, is whether defendant made proper objection. When an inculpatory statement was first offered, defendant objected generally. The objection was sustained. Plaintiff's attorney indicated that he had some law to discuss on the issue. A recess was called and the jury excused until after lunch. When the trial resumed, the court stated that it was allowing the statement to be introduced, citing Grant's Sons v. Phoenix Assur. Co. (25 A D 2d 93). Defendant's attorney promptly asserted that the Grant's case was not pertinent, that he relied on the Hatch case (supra) and on Stanley Co. v. National Sur. Corp. (179 Misc. 493) and the authorities there cited which followed the Hatch rule in fidelity bond cases. True, he did not stop there, but went on to argue the inapplicability of the Grant's case. Overall, however, the clear and specific objection had been made that the Tremblay statements were not part of the transaction (res gestae) and were thus inadmissible as hearsay. Actually, since the basis for the objection was not curable, there was questionable need to make the objection specific (cf. 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 4017.04; Richardson, Evidence [9th ed.], § 543).
*529 The next issue is whether defendant preserved its objection. At the close of the proof, both sides having rested, defendant moved to strike the inculpatory statements and renewed its objections made at the time of their introduction. The motion was denied. After the verdict was returned, motions were reserved for a later day, and at that time defendant moved to set the verdict aside, inter alia, on the ground that the inculpatory statements had been improperly received, citing the Hatch case (supra), the Stanley case (supra), and still another case. The only thing defendant had not done was to take a specific exception to the charge on this issue, a futile and legally unnecessary step in view of the court's immediately preceding ruling rejecting defendant's contention (4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 4017.07, pp. 40-82 and 40-83, esp. n. 36, and cases cited). The objection was indeed preserved, and well beyond the necessity of making sure that the trial court was aware of defendant's persistent contention that the inculpatory statements were incompetent.
As already suggested, the Hatch rule (65 N.Y. 489, 496, supra) not only is of long standing and generally followed but fits neatly into the general rules of evidence excluding hearsay (Tenth Nat. Bank of New York City v. Darragh, 1 Hun 111; Wieder v. Union Sur. & Guar. Co., 42 Misc. 499, 500-501; Marcus v. Fidelity & Deposit Co., 164 App. Div. 859, 861; Ann.: Extra-Judicial Admissions by Principal as Evidence against Surety, 60 A. L. R. 1500, passim, supra; Ann.: Fidelity Bond-Evidence, 65 ALR 2d 631 et seq., supra; 31A C. J. S., Evidence, § 366, supra; 21 N. Y. Jur., Evidence, § 313; 57 N. Y. Jur., Suretyship and Guaranty, § 275; Richardson, Evidence [9th ed.], § 319). The so-called res gestae exception is not a true exception but relates to the verbal acts of the faithless employee at the very time that he is conducting his employer's business. The Grant's case (25 A D 2d 93, supra), insofar as it introduces the factor of the employee's continued employment, rests on a doubtful logic and an even more doubtful pragmatic basis.[2] Certainly, *530 analogous experience with the rules governing admissions by agents suggests that the status of employment by itself is not a determining factor. It is old law that the mere fact that an employee makes a statement during the term of his employment does not make the statement admissible against the employer, unless it is also made during the course of and pursuant to his employment (Richardson, Evidence [9th ed.], § 329, and cases cited). From a practical point of view, the continued employment of the declarant makes the statement less reliable, rather than more, by enhancing the risk of collusion. And the facts of this case exemplify that increased risk.
To be sure, an employer situated as Letendre may have a difficult problem of proving both his loss and that it was one covered by the bond. In this case, however, the discrepancy was shown, prima facie, by the records kept or supervised by Tremblay. It is not true, therefore, that plaintiff could not make out his case without the questioned statements. He could also have offered the testimony of Tremblay in chief as he did, if only to show that he was offering all available proof. Then, if he chose, he could offer the inculpatory statements to impeach, but only to impeach, this obviously unfriendly witness. The difference would be, not only in the order of the proof, but that the jury must also have then been instructed to limit the use of the inculpatory statements to testing the credibility of Tremblay and not to accept them as evidence of the facts they purported to recite. In some cases, this distinction might not have been too important; but here the distinction was vital, because Letendre's case had serious vulnerabilities.
Letendre admitted that there were authorized, but unrecorded, payments, and hence the record discrepancies alone were not the strongest evidence of Tremblay's misconduct. Letendre never denied Tremblay's testimony that throughout Letendre's stay in Florida Tremblay sent him, unopened, the bank statements and vouchers, in addition to the monthly records of receipts, disbursements, and bank deposits. Ralph Guido, the "bookkeeper" for the gasoline station, never testified, although it was his job to transcribe the daily records into the monthly records, and note the claimed deposits. Letendre never explained why certain authorized disbursements were not recorded, although the station's cash register ran a continuous tape, records of daily and *531 monthly receipts and disbursements were maintained, and a perpetual inventory was kept on a daily basis. One of the concededly authorized, but partly unrecorded, payroll items was compensation for Tremblay's brother, Andre.
Letendre's explanation for retaining Tremblay, after discovering the discrepancies, raised a grave issue of Letendre's credibility for the jury. Pointing in a contrary direction is the fact that Tremblay's continued employment was on the basis that his wages would be credited to the shortage. The use of Tremblay was particularly significant since the station operated 24 hours a day on three shifts and, according to the uncontradicted testimony, one man would hold each shift (with all the opportunities that there were for larcenies).
Critical to Letendre's case was the establishment of Tremblay's misconduct, because the bond covered him alone. A larceny of another employee, unless condoned or abetted by Tremblay, would not entitle Letendre to recover. Hence, the significance of the inculpatory statements. The evidentiary-fact issues were many in this otherwise simple case, and the inculpatory statements, if received in evidence without limitation, and so weighed by the jury, might well have had decisive effect.
In any event, since the court is now propounding a new rule of evidence, not considered or utilized by the trial court or the Appellate Division, a new trial should be required as a matter of elemental justice. The trial court and the Appellate Division reviewed the trial motions and the jury's finding of facts on various bases, most of which this court now holds erroneous. As already observed, the issues of fact in this case were not nominal but very real. This might not be so important because, whether the basis was erroneous or not, the trial court's ruling that the hearsay statements are to be considered as evidence in chief has finally been upheld. But more important is the Appellate Division's erroneous holding that defendant had failed to preserve its objection, thus depriving defendant of its right to a review of the facts by that court. Equally important too was the misleading of defense trial counsel who relied on the general principles of evidence law obtaining in this State and elsewhere.
Finally, if new exceptions to the hearsay rule, based on the broad admissibility of hearsay espoused by advanced thinkers, are to be propounded, the jury should be instructed on the variant *532 weight to be given extrajudicial statements, whether sworn or not, and trial testimony, sworn and subject to cross-examination. The considered justification for the hearsay rule as an adjunct to a system using lay juries to find facts should not be lightly overborne. Consequently, even if the abrogation of the hearsay rule is welcome, and perhaps it may be, it should not be done as a happenstance in achieving a result in a particular class of case and without balancing cautionary instructions to the jury.
Accordingly, I dissent and vote to reverse the judgment in favor of plaintiff and to grant a new trial.
Order affirmed.
NOTES
[1] At the present time, fidelity bonds generally involve a two-party contract between the employer and the insurer, whereas, in the early days of this form of underwriting, the employee would have to seek his own surety. It would, therefore, seem more appropriate to describe the bond as a fidelity insurance policy.
[1] "In view of the variable state of the existing law, this court is determining that in an action on a surety bond a principal-employee statement is admissible regardless of res gestae or the termination of employment, but requires, as governed by the factual situation, instructions by the court as to the use and the purpose for which the statement is admitted. The employer, indemnified by the bond, is entitled to prove his action, but likewise the surety is entitled to be protected as to possible collusion between the employer and employee in attempting to recover under the coverage of the bond. (Cf. Marcus v. Fidelity & Deposit Co., 164 App. Div. 859; Grant's Sons v. Phoenix Assur. Co., supra.)

"In the present instance, because of the failure of the defendant to make proper objections to the admission of the statements and to make appropriate requests to charge the jury, it is not necessary to consider how the statements should have been limited as to their proof of the facts contained therein." (27 A D 2d 205, 206.)
[2] Grant's case also rested on other alternative grounds. One was that the declarants (faithless employees) were no longer available in the jurisdiction as witnesses. In this case, of course, Tremblay testified at the trial. Another was that the fidelity bond in Grant's case covered all employees during the term of employment. (25 A D 2d, supra, p. 96.)